**EXHIBITS**

EXHIBITS AS FOLLOWS;

EXHIBIT-FLASH

EXHIBIT-FLASH NEVER EXPLAINED THE LAW

EXHIBIT-MENTAL HISTORY

EXHIBIT-MANDAMUS

EXHIBIT-AFFIDAVIT

EXHIBIT-FLASH

EXHIBIT "FLASH"


Testimony of John "jack" Laishley

29

EXHIBIT- FLASH, MARKED, DESIGNATED AND ENTERED

1    MR. LAISHLEY:  And then lastly, Judge, as I

2    have set forth, it was the, and if it's all right for

3    me to call it the Jenkins charge, the tardy jury

4    instruction that the Court allowed to be inserted into

5    its charge to the jury offered at the last moment or as

6    nearly at the last moment, as I recall.  Without the

7    benefit of the transcript it may have been after some

8    of the charge to the jury.  In any event, it was

9    contemporaneous with the charge to the jury, and it was

10   contrary, it was offered contrary to the Court's

11   standing instructions.  And it's our position that

12   that, well, I think I said in my motion is that the

13   force of the Jenkins charge cannot be overstated, and I

14   would add to that the force and effect of that charge

15   cannot be overstated.

16        I did not have the opportunity to and I don't

17   believe it is my responsibility as his defense counsel

18   to offer charges that would be detrimental to his case,

19   and certainly the Jenkins charge is one of those that

20   would be detrimental.  I have since been provided with

21   a copy of that case.  I have read the case, I have

22   studied it, I have studied its predecessor, the Durham

23   case, and if that had been offered, presented to me the

24   week before trial as required by Your Honor, then

(44)

1  certainly I would have counseled Mr. Dreyfuse

2  accordingly, and it may have made a difference in not

3  only his strategy but also in his desire to take the

4  state's offer.  It's very -- Judge, I cannot overstate

5  the force of that Jenkins charge and the effect that it

6  had on, I'm sure the effect that it had on the jury.

7  And also Mr. Chiles was able to very very effectively

8  argue that in his closing and was able to mold his

9  examination of his witnesses, his medical experts as

10  well as his cross-examination of our expert around the

11  facts of the Jenkins case and the instruction that it

12  produced.

13        MR. CHILES:  Could I make one thing clear on

14  that point, Your Honor?

15        THE COURT:  Sure.

16        MR. CHILES:  I don't think Mr. Laishley is

17  suggesting, but I don't want it to be unclear on the

18  record, it's not that we had this case and had that

19  instruction prepared all along and just sat on it and

20  offered it at the minute.  We did not actually find

21  that case doing research until the night before it was

22  given to Mr. Laishley, and we realized the significance

23  of it only after having heard the testimony of both

24  Dr. Denning and the defense expert, and then in

81



1  researching we found that case and I notified

2  Mr. Laishley of it the night before, summarized it,

3  presented him with both a proposed jury instruction and

4  a copy of the case before trial began that following

5  Wednesday morning.

6         THE COURT:  Just so the record is clear, I

7  think, Mr. Laishley, in the Jenkins case you are

8  believing that the instructions that said the

9  reasonable and expected outcome of the injuries

10  suffered, that the preexisting condition does not I

11  will say mitigate or excuse the results of the beating

12  that was administered.

13         MR. LAISHLEY:  I think it's even stronger

14  than that, Judge, but, yes.  I agree, I want to say I

15  agree that Jenkins is good law.  I have studied

16  Jenkins, I have studied its predecessor Durham, and I

17  have studied the instruction that was offered in both

18  of those cases and compared it to the instruction that

19  the state offered, and I couldn't find any error, I

20  couldn't punch a hole in it anywhere, Judge, and I

21  consider it to be, yeah, it was detrimental.

22         THE COURT:  And you did offer Dr. Touchon?

23         MR. LAISHLEY:  Touchon, yes.

24         THE COURT:  Dr. Touchon in your case and



```
 1    chief, you brought in a cardiologist for the purpose of

 2    influencing the jury to believe that this man died of a

 3    cardiac event rather than die of having been beat with

 4    a baseball bat; is that correct?

 5         MR. LAISHLEY:  Yes.  But the Jenkins

 6    instruction obliviates that argument, Judge.

 7         THE COURT:  I think that's what Mr. Chiles'

 8    point is is after you raised that defense and that you

 9    brought Dr. Touchon in, and I had my court reporter

10    type up that segment last week, I don't find the

11    transcript right now, but --

12         THE CLERK:  Do you want me to get it?

13         THE COURT:  Yes, go look on my desk.

14         It was discussed that before the jury was

15    charged you objected.  You felt that the state had not,

16    as you say in your motion, complied with my, I guess

17    it's my administrative order.  I'm not sure it's

18    actually an order, but we try to get the instructions

19    and the voir dire the week before, which is just trying

20    to manage the trial.  But I don't think it was that

21    prejudicial.  I think it was an appropriate instruction

22    to give in light of the evidence, particularly when you

23    called your own medical expert to refute the state's

24    case as to the cause of death, and I will find that it
```

```
 1   was appropriate to give and it was timely disclosed,

 2   and I will overrule your objection on that basis,

 3   reconsideration.

 4           MR. LAISHLEY:  If I might, Your Honor, the

 5   instruction was not offered after Dr. Touchon

 6   testified.  My recollection was that -- by the way, the

 7   state had a summary of what Dr. Touchon was going to

 8   testify to, and I'm sure Mr. Chiles reviewed that with

 9   his medical experts prior to trial, but that

10   instruction came early in the morning just as you were

11   about to take the bench and the trial proceeded.  I

12   mean, it just got put in there and on we go, on we

13   went.  And my point is if that had been -- and

14   Mr. Chiles did know what we were going to testify to, I

15   mean, that was disclosed.

16           THE COURT:  And that's to be expected in a

17   trial, as the rules require if you're going to call an

18   expert they have to do a report.  You have to remember

19   Dr. Touchon's really wasn't a report, it was a letter

20   that we let you substitute that and that would have

21   given Mr. Chiles some notice as the anticipated

22   testimony.

23           You're right, the morning that the case went

24   to trial we did instructions I guess the evening
```



1    before, and I'm just looking at the transcript here

2    where first thing I say is you have heard all the

3    evidence, I'm going to ask you to retire to your jury

4    room so we can consider some other matters, and then we

5    brought out the copies of the instructions, you renewed

6    your Rule 29 motion, we changed the instruction to

7    reflect that Mr. Dreyfuse had testified.  As is my

8    custom, I think we went over every page asking what the

9    objections were, if any.

10             There's a long discussion about what unlawful

11   assault, maim, disfigure, I remember we had discussion

12   about that.  You gave the unlawful wounding.  That's

13   where we had the discussion about following the

14   statutory language there.  And then we had a discussion

15   about, apparently on page 19 of the instructions, that

16   they may infer a person intends the natural and

17   probable consequences of their actions, and that comes

18   down to the Jenkins instruction that the Court

19   instructs the jury that to be guilty of murder it's not

20   necessary that the wounds be the direct cause.  The

21   state provided the case law for that.  And you say that

22   was just provided to you this morning.

23             You suggested better language than the

24   Jenkins language, and I asked if you had anything to



17

1   offer.   You cite the State v Durham case, you said you

2   haven't pulled it but the report discusses it.   On note

3   5 I think of the Durham case, the defendant's criminal

4   response for homicide where he inflicts a wound

5   resulting in death, but because the death is related to

6   the proper treatment of the wound such treatment or

7   effect of preexisting physical disability.   I say I

8   think Dr. Touchon simply said he had a heart attack and

9   died but did not disagree with the fact that that

10   surgery was a significant event.

11         I'm going to deny your motion, Mr. Laishley.

12   I think the law was correctly stated.   I think it was

13   an instruction that needed to be given, especially in

14   light of Dr. Touchon's attempt to minimize the

15   condition or minimizing the cause and that it was

16   appropriately appropriate for the Court to give that

17   instruction.   So I will deny your motion and note your

18   objection.

19         Anything else, sir?

20         MR. LAISHLEY:   Just that everything you said

21   states my case, is that if we would have known that

22   that was coming in like that that he could have, should

23   have been counseled accordingly and that it could have

24   made a difference, a substantial difference in his

2. **Rule 42.02 of the West Virginia Trial Court Rules (T.C.R.) (1999) (Presentation of Jury Instructions) states:**

Each counsel shall prepare jury instructions, indicating citations and authorities, and if the court directs, verdict forms and special interrogatories, and present them to the presiding judicial officer and serve them on opposing counsel not less than three (3) business days before the day set for trial or at such other times as the presiding judicial officer may order.

See also *W.Va. Code*, 56-6-19 (1923) (Instructions to jury generally; form and manner of giving); *W.Va. Code*, 56-6-20 (1923) (Reading instructions to jury; instructions part of record); *W.Va. Code*, 56-6-21 (1923) (Time for examining instructions; objecting thereto and settlement there of; and *W.Va. Code*, 56-6-22 (1923) (Oral instructions by court; written instructions during trial).

## 1.03 GENERAL DISCUSSION OF JURY INSTRUCTIONS

See F. Cleckley, <u>Handbook on West Virginia Criminal Procedure</u>, Vol. 2, Chapter XVIII, Instructions to the Jury (2d Ed. 1993) in which the following topics are discussed:

A. Definition of "Instructions"

B. Requirement for Instructions

C. Responsibility to Instruct

D. Purpose of Instructions

E. Standard of Review of Instructions on Appeal

F. Tailoring Instructions

G. Defendant's Theory of the Case and Other Problem-Causing Instructions

H. Judge's Comment on Evidence

I. When Instructions Given

EXHIBIT-FLASH NEVER EXPLAINED THE LAW

EXHIBIT "FLASH NEVER EXPLAINED THE LAW"

46

As evidenced by the following attatched Cases that were sent
to John "JACK" Laishley, The Petitioner's Defense Counsel, on
the top of the Case page, it is obvious that the Cases were not
recieved until October 22, 2013, at 8:18 PM, which was 4 Days
AFTER the END of the Trial, The Case(s) are of the "Jenkins"
Charge that Laishley was totaly unaware of, and that were a standard
set in well established Black Letter Law.

This was not made aware to the defendant until 4 days AFTER the TRIAL's
END and the Defendant's being found guilty, which was totally the
opposite of what was explained to Him prior to Trial.

Furthermore, as evidenced by **PAGE 10** of the Jenkins Case, at the
last paragraph there exists the markings that PROVE Attorney Laishley
was still in question of the "Jenkins" law being in existance in
THIS STATE as can be deduced by the markings made on this page.

If this LAW would have been known to John Laishley, and had He
informed the defendant of such a Law, then surely the defendant
would have accepted a plea of 30 years rather than face a CERTAIN
life wiithout, for a conviction that was guranteed by the LAW that
a Defendant IS criminally responsible where he inflicts wounds
resulting in death, even though the death is related to the proper
teatment or the effect of a pre existing physical disability, as
is the case since the Victim died from a Heart attack during a
surgery 9 days after an attack, This is an OBVIOUS mistake in Law
and the WRONG advice by such from defense Counsel.

89

| | |
|---|---|
| **From:** | noreply@fastcase.com |
| **Sent:** | Tuesday, October 22, 2013 8:18 PM — *GUILTY OCT 18 - 4 DAYS !* |
| **To:** | jlaishley@frontier.com |
| **Subject:** | Fastcase Document - State v. Jenkins |

*(This document has been sent to you from Fastcase by John Laishley)*

229 W.Va. 415
729 S.E.2d 250

**STATE of West Virginia, Respondent**
v.
**Henry C. JENKINS, Petitioner.**

No. 11–0362.

**Supreme Court of Appeals of
West Virginia.**

**Submitted March 27, 2012.
Decided June 21, 2012.**

**Summaries:**

**Source: Justia**

In this appeal, Defendant challenged an order of the circuit court convicting him of felony murder and child neglect resulting in death and sentencing him to life with mercy for the felony-murder conviction and a consecutive sentence of three to fifteen years for child neglect resulting in death. The Supreme Court affirmed, holding (1) the circuit court did not err in allowing the State to proceed against Defendant for the separate offenses of felony murder, death of a child by a parent, and child neglect resulting in death; (2) the evidence was sufficient to prove Defendant caused his son's death beyond a reasonable doubt; (3) the circuit court did not err in suppressing Defendant's statement only during the State's case-in-chief; (4) the circuit court did not err in allowing the State to use photographs of the child's autopsy; and (5) the circuit court did not err in permitting the use of certain W. Va. R. Evid. 404(b) evidence at trial.

[729 S.E.2d 254]

*Syllabus by the Court*

1. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might

1

have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus Point 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

2. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

3. " 'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syl. pt. 5, *Casto v. Martin* [159 W.Va. 761], 230 S.E.2d 722 (W.Va.1976) citing Syl. pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955).' Syllabus Point 2, *State v. Rector*, [167] W.Va. [748], 280 S.E.2d 597 (1981).'

[729 S.E.2d 255]

Syl. pt. 3, *State v. Oldaker*, [172] W.Va. [258], 304 S.E.2d 843 (1983)." Syllabus Point 6, *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983).

4. " 'Double jeopardy prohibits an accused charged with felony murder, as defined by W. Va.Code § 61–2–1 (1977 Replacement Vol.) from being separately tried or punished for both murder and the underlying enumerated felony.' Syllabus Point 8, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983)." Syllabus Point 8, *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990).

5. "The granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discretion." Syllabus Point 3, *State v. Walker*, 188 W.Va. 661, 425 S.E.2d 616 (1992).

6. "The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense." Syllabus Point 1, *Conner v. Griffith*, 160 W.Va. 680, 238 S.E.2d 529 (1977).

7. "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind, but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case." Syllabus Point 6, *State v. Beale*, 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401 (1927).

8. "The felony-murder statute applies where the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection, as where the killing is done in flight from the scene of the crime to prevent detection or promote escape." Syllabus Point 2, *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480 (1982).

9. " 'The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation

2

in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.' *State v. Williams*, 172 W.Va. 295, [311,] 305 S.E.2d 251, 267 (1983)." Syllabus Point 5, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987).

10. "In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death indirectly through a chain of natural causes." Syllabus Point 2, *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973).

11. "A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or related to such treatment or effect of a pre-existing physical disability of the victim." Syllabus Point 3, *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973).

12. "Pursuant to W. Va.Code § 61–2–1 (1991), death resulting from an overdose of a controlled substance as defined in W. Va.Code § 60A–4–401 *et seq.* and occurring in the commission of or attempt to commit a felony offense of manufacturing or delivering such controlled substance, subjects the manufacturer or deliverer of the controlled substance to the felony murder rule." Syllabus Point 3, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

13. "It is a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." *Syllabus Point 2, State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978).

14. "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syllabus Point 3, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978).

[729 S.E.2d 256]

15. "Where a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony contradicting the prior voluntary statement knowing that such prior voluntary statement is inadmissible as evidence in the State's case in chief." Syllabus Point 4, *State v. Goodmon*, 170 W.Va. 123, 290 S.E.2d 260 (1981).

16. "A confession that has been found to be involuntary in the sense that it was not the product of the freewill of the defendant cannot be used by the State for any purpose at trial." Syllabus Point 2, *State v. Goff*, 169 W.Va. 778, 289 S.E.2d 473 (1982).

E. Scott Stanton, Esq., Deputy Chief Public Defender, Fayette County Public Defender's Office, Fayetteville, WV, for Petitioner.

Brian D. Parsons, Esq., Fayette County Assistant Prosecuting Attorney, Fayetteville, WV, for Respondent.

**PER CURIAM:**

In this appeal, Henry C. Jenkins, defendant below (hereinafter "Petitioner"), challenges a June 28, 2010, order of the Circuit Court of Fayette County convicting him of "felony murder" and "child neglect resulting in

3

death," and sentencing him to life with mercy for the felony-murder conviction, and a consecutive sentence of three to fifteen years for "child neglect resulting in death." Herein, Petitioner alleges the following assignments of error: 1) that the circuit court erred in allowing the State to proceed against him for the separate offenses of felony murder, "death of a child by a parent," and "child neglect resulting in death;" 2) that the evidence was insufficient to prove that Petitioner caused his son's death beyond a reasonable doubt; 3) that the circuit court erred in suppressing Petitioner's statement only during the State's case in chief; 4) that the circuit court erred in allowing the State to use immaterial and gruesome photographs of the child's autopsy; and 5) that the circuit court erred in permitting the use of certain 404(b) evidence at trial. After thorough review of the petition for appeal, all matters of record and the briefs and argument of counsel, we find no error. We therefore affirm Petitioner's conviction.

# I.
## FACTUAL AND PROCEDURAL HISTORY

On November 19, 2008, Petitioner's fourteen-year-old son, C.C.J.[1], died at Women and Children's Hospital in Charleston, West Virginia. C.C.J., who suffered from cystic fibrosis, was later determined by autopsy to have two non-prescribed controlled substances, oxycodone and valium, in his blood stream. At the time of his death, C.C.J. resided with his father, Petitioner, in a mobile home in Fayette County, West Virginia. The child's mother, Naomi Griffith, was incarcerated at the time of C.C.J.'s death. Both of C.C.J.'s parents had been frequent abusers of pain prescription medications throughout his life. According to the record, C.C.J. had a life-long struggle with cystic fibrosis and had been in and out of hospitals many times during his childhood combating complications with his illness.

On the evening of November 13, 2008, several persons gathered at Petitioner's home. According to the evidence presented at trial, Holly Burdette arrived at the home around 10:00 p.m. after receiving a phone call from C.C.J. asking for a ride. Burdette was drinking with Marshall Walker and Shaun Stark and asked them to transport C.C.J. and Petitioner. They drove to the home of Josh Settle, a local drug dealer, where Petitioner traded Mr. Settle a bag of C.C.J.'s Jeff Gordon memorabilia collection for three oxycodone '30' pills. After the exchange, C.C.J. went into Settle's house to see a knife. C.C.J. was alone with Settle during this time. Settle denied giving C.C.J. any drugs.

[729 S.E.2d 257]

Burdette testified at trial that, of the three oxycodone pills that Petitioner obtained from Settle, she only saw two. Petitioner gave her one of the pills, whereupon she and Stark went to a neighbor's trailer. After visiting with neighbors, Burdette and Stark returned to the Jenkins home. Upon their return, Burdette found C.C.J. on the front porch vomiting. She testified that she, Petitioner, and C.C.J. then stayed up for a few more hours. C.C.J. and Petitioner eventually fell asleep on the couch, while Burdette slept on the floor with Stark.

Burdette testified that she woke C.C.J. up around 5:00 a.m. and asked him if he was feeling better. She testified that C.C.J. responded that he did. She then drifted off to sleep and woke approximately two hours later. When she awoke around 7:00 a.m., Petitioner was already awake sitting up in a chair smoking a cigarette. She heard what she described as a gargling noise and determined it was coming from C.C.J. Stark began performing CPR on C.C.J. Burdette testified that at some point she heard Petitioner on the phone and she believed that Petitioner did not realize the seriousness of C.C.J.'s condition. They then placed C.C.J. in a cold shower and Petitioner tried to revive C.C.J. Petitioner then called an ambulance. Upon their arrival, the EMTs described C.C.J. as having blue skin and was essentially not breathing. He collapsed into a vegetative state. C.C.J. died on November 19, 2008, after being removed from life support.

Burdette testified that Petitioner told her sometime after C.C.J.'s funeral that he felt responsible for C.C.J.'s death because he had "shot C.C.J. up with an oxycontin 30." On cross-examination, Burdette testified that on

*93*

the night of November 13, 2008, she had approximately ninety valium pills in her possession. She testified that when she woke up and found Petitioner awake, he asked her for a valium. When she went to her purse she found all of the pills missing.

Detective J.K. Sizemore of the Fayette County Sheriff's Department investigated the case. Detective Sizemore obtained recorded telephone conversations which were admitted at trial between Petitioner and C.C.J.'s mother, Naomi Griffith, while she was an inmate at Lakin Correctional Facility. During one of the conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30." In another phone call he stated that C.C.J. had been obtaining drugs from "other places too."

Dr. Zia Sabet of the West Virginia Medical Examiner's Officer performed an autopsy on C.C.J. According to C.C.J.'s death certificate, the immediate cause of his death was "hypoxic encephalopathy due to broncho-pneumonia and cystic fibrosis." The other significant condition listed was diabetes mellitus, Type I. The certificate was signed by Dr. Zia Sabet. The death was classified as "natural" on the certificate.

The official toxicology report issued by Dr. James Kraner, Chief Toxicologist of the State Medical Examiner's office, on January 21, 2009, states that traces of oxycodone in the blood samples first taken at the hospital on November 14, 2008, were 0.06 mg/L, and that diazepam and nordiazepam [2] were found at levels of 0.04 mg/L and 0.15 mg/L respectively. All of these levels were considered to be therapeutic.[3] Blood samples taken at the time of C.C.J.'s death contained similar levels of diazepam and nordiazepam.

On May 22, 2009, Detective Sizemore obtained an arrest warrant for Petitioner charging him with "death of a child by a parent" in violation of W. Va.Code § 61–8D–2a. Petitioner was arrested and taken into custody on May 27, 2009. Subsequently, on July 28, 2009, Dr. Sabet and Dr. Kaplan issued a "Report of Death Investigation and Post–Mortem Examination Findings." The reports states that

"It is our opinion that [C.C.J.], a 14–year–old male teenager, died as the result of combined oxycodone and diazepam intoxication

[729 S.E.2d 258]

resulting in fatal hypoxic encephalopathy following a 5–day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions."

As to the manner of death, the report states,

"[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as Undetermined."

Petitioner was indicted before the Fayette County Grand Jury for the felony offenses of "felony murder" in violation of W. Va.Code § 61–2–1; "delivery of a controlled substance, to-wit oxycodone" in violation of W. Va.Code § 60A–4–401; "death of a child by a parent, guardian or custodian" in violation of W. Va.Code § 61–8D–2a; and "child neglect resulting in death" in violation of W. Va.Code § 61–8D–4a(a).

At the jury trial, the Court agreed to instruct the jury that the charge contained in count four, "child neglect resulting in death" (W. Va.Code § 61–8D–4a(a)) is a lesser included offense of count three, "death of a child by a parent" (W. Va.Code § 61–8D–2a). Following the close of evidence, during deliberations, the jury passed a

note to the bailiff with the following question: "Does the felony that was committed have to *cause* the death or *contribute* to it?" (emphasis in original). After argument of counsel, the Court passed a note back to the jury stating,

> Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court. They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may now continue to deliberate toward verdicts in this case.[4]

Following several more hours of deliberation, the jury returned a verdict finding Petitioner guilty of the offense of "felony murder" (with a recommendation of mercy), and guilty of the offense of "child neglect resulting in death" as a lesser included offense of "death of a child by a parent, guardian or custodian." By sentencing order dated June 28, 2010, the circuit court sentenced Petitioner to consecutive sentences of life with a recommendation of mercy on the count of felony murder, and three to fifteen years on the count of "child neglect resulting in death." Following sentencing, Petitioner filed the instant appeal.

## II.
## STANDARD OF REVIEW

When a Petitioner raises a sufficiency of the evidence argument, this Court follows the standard of review set forth in Syllabus Point 3 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), which provides that:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

This Court has also stated that:

> The function of an appellate court when reviewing the sufficiency of the evidence to

[729 S.E.2d 259]

support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.*, Syl. Pt. 1.

We review a circuit court's exclusion of evidence under an abuse of discretion standard. "[R]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Guthrie*, 205 W.Va. 326, 332, 518 S.E.2d 83, 89 (1999) ( *quoting State v. Louk*, 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983), *citing* Syl. Pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)).

6



48

" ·The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syl. pt. 5, *Casto v. Martin* [159 W.Va. 761], 230 S.E.2d 722 (W.Va.1976) citing Syl. pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955).' Syllabus Point 2, *State v. Rector*, [167] W.Va. [748], 280 S.E.2d 597 (1981).' Syl. pt. 3, *State v. Oldaker*, [172] W.Va. [258], 304 S.E.2d 843 (1983)."

Syllabus Point 6, *State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983).

With these standards in mind, the parties' arguments will be considered.

# III.
# DISCUSSION

## A. Election of Charges

In his first assignment of error, Petitioner maintains that the circuit court erred in allowing the State to proceed against him for the offenses of "felony murder," the underlying felony being delivery of oxycodone; "death of a child by a parent," the cause of death being "impairment of physical condition by delivery of oxycodone;" and "child neglect resulting in death," the neglect allegedly being "allowing or permitting child to abuse oxycodone." Petitioner's counsel filed a "Motion to Elect" requesting that the State elect a count in the indictment and a theory under which to proceed. Another similar motion was made by Petitioner while arguing for a judgment for acquittal after the end of the State's case, and then again at the close of evidence. Petitioner alleges that the issue was also addressed during discussions regarding instructions and how to draft the verdict form.

Petitioner argues that the circuit court failed to require the State to elect a theory of prosecution in two different manners. First, Petitioner argues that it was inappropriate for the State to indict for felony murder alleging a specific felony of delivery of a controlled substance in count one of the indictment, and then indict for that same underlying felony in count two of the indictment. Indeed, this Court has held that

"[d]ouble jeopardy prohibits an accused charged with felony murder, as defined by W. Va.Code § 61–2–1 (1977 Replacement Vol.) from being separately tried or punished for both murder and the underlying enumerated felony." Syllabus point 8, *State v. Williams,* 172 W.Va. 295, 305 S.E.2d 251 (1983).

Syl. pt. 8, *State v. Giles,* 183 W.Va. 237, 395 S.E.2d 481 (1990).

It would have been clear error in this case for Petitioner to be convicted of both the offense of felony murder and the underlying offense of delivery of a controlled substance. However, when the circuit court prepared the verdict form and sent the charge of felony murder to the jury, the charge of "delivery of a controlled substance" in count two was not given to the jury as a separate and distinct offense upon which a verdict of guilt could be returned. This Court has previously stated that "[t]he granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discretion." Syl. Pt. 3,

[729 S.E.2d 260]

*96*

*State v. Walker,* 188 W.Va. 661, 425 S.E.2d 616 (1992). When we review the nature of the charges for which Petitioner was indicted, we conclude that the State could have reasonably established the requisite malice or intent required for proving the offense of "death of a child by a parent" by proving that Petitioner delivered a controlled substance to his child that resulted in C.C.J.'s death. Thus, we find no abuse of discretion by the circuit court in waiting until it prepared the verdict form to dismiss count two of the indictment. The jury was not permitted to consider the underlying offense of delivery of a controlled substance as a separate and distinct felony offense. Thus, we find no error on this issue.

Additionally, Petitioner alleges that the circuit court failed to require the State to elect between a prosecution theory of felony murder or "death of a child by a parent." In other words, fundamentally, Petitioner alleges that it violated double jeopardy to prosecute him for both offenses that arose from the single act of delivering a controlled substance to his child. Petitioner maintains that our Legislature has not explicitly permitted multiple prosecutions for different offenses arising from a single act. We conclude that Petitioner's allegation is without merit.

This Court has held that

"[t]he Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense."

Syllabus Point 1, *Conner v. Griffith,* 160 W.Va. 680, 238 S.E.2d 529 (1977). When the jury returned its verdict in this case, Petitioner was not convicted of the offense of "death of a child by a parent." Rather, he was convicted only of the lesser included offense of "child neglect causing death." [5] Because Petitioner was not convicted of the offense which he claims violates double jeopardy, "death of a child by a parent," Petitioner fails to demonstrate that he suffered multiple punishments or any similar other harm by allowing the jury to consider this charge along with the charge of felony murder. While perhaps it would have been more appropriate for Petitioner to allege a double jeopardy violation regarding the two offenses for which he was actually convicted, felony murder and "child neglect resulting in death," Petitioner's counsel represented during oral argument that he is not appealing Petitioner's conviction for this offense. Accordingly, we will not consider that issue. 

## B. Sufficiency of Evidence

In the next assignment of error, Petitioner alleges that in proceeding under a felony murder theory, the State's evidence was insufficient to prove that: 1) the delivery of the oxycodone itself caused the death of C.C.J. and 2) that Petitioner delivered either of the controlled substances, oxycodone or valium, to C.C.J. We will address each of these issues in turn.

## 1) Causation

Petitioner bases his first argument primarily on the testimony of Dr. Kraner and Dr. Sabet who both opined that it was the combination of oxycodone and valium that caused C.C.J.'s death. Petitioner alleges that neither expert could opine that the oxycodone itself caused C.C.J.'s death. Further, Petitioner places great weight on the evidence indicating that both drugs found in C.C.J. were at "therapeutic" levels. Conversely, the State argues that there was sufficient evidence presented to the jury from which the jury could convict, and the jury did convict, Petitioner of felony murder.



The crux of Petitioner's argument, while rather inartful, appears to be that the State must prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death in order to sustain his conviction. We reject this argument because it is wholly unsupported

[729 S.E.2d 261]

by the felony murder statute, W. Va. Code § 61–2–1 (1991), as well as our jurisprudence.

In 1991, the West Virginia Legislature added the felony offense of "manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code" to the specifically enumerated list of felonies that may be the basis for first degree murder. West Virginia Code § 61–2–1 (1991) provides the following:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or *a felony offense of manufacturing or delivering a controlled substance* as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

This Court has held that "[i]n any case of homicide there must be proof of the identity of the deceased and the causation of death." *State v. Myers*, 171 W.Va. 277, 280, 298 S.E.2d 813, 817 (1982). "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind, but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case." Syllabus Point 6, *State v. Beale*, 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401 (1927). Unlike traditional first degree murder, felony-murder does not "require proof of the elements of malice, premeditation, or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission of, or the attempt to commit, one of the enumerated felonies." Syllabus Point 7, in part, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978). "The felony-murder statute applies where the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection, as where the killing is done in flight from the scene of the crime to prevent detection or promote escape." Syl. Pt. 2, *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480 (1982). We have explained, with regard to felony murder, that:

"The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim *as a result of* injuries received during the course of such commission or attempt." *State v. Williams*, 172 W.Va. 295, [311,] 305 S.E.2d 251, 267 (1983).

Syl. Pt. 5, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987) (emphasis added).

In *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973), a voluntary manslaughter case, this Court discussed whether the criminal agency of the defendant caused the death of her husband, where the defendant had shot her husband, but the medical evidence revealed that the bullet wound by itself would not have caused

98

the death. *Id.* at 516, 195 S.E.2d at 148. It was determined that the direct cause of death was a fatty liver, and the death was accelerated or triggered by administration of anesthesia during surgery to repair the wound or another chemical agent, or by trauma caused by the bullet. *Id.* at 513–15, 195 S.E.2d at 147–48. In other words, the wound would not have caused the death, but for the pre-existing physical disability and/or subsequent treatment. Neither of the doctors could say with certainty that either of these was the causative factor, but testified to the probability that one or the other triggered or accelerated the death. *Id.* at 520, 195 S.E.2d at 150.

[729 S.E.2d 262]

In discussing the corpus delicti requirement of proving causation for purposes of obtaining a conviction for voluntary manslaughter, this Court stated:

The law in practically every American jurisdiction, including West Virginia, is that the corpus delicti in cases of felonious homicide consists of two basic elements: (1) Death of the victim; and (2) the existence of a criminal agency as a cause thereof. 40 C.J.S. *Homicide* Section 186, pages 1086–1087; 40 Am.Jur.2d, *Homicide,* Section 4, page 297; *State v. Craig,* 131 W.Va. 714, 51 S.E.2d 283 [ (1948) ];*State v. Koontz,* 117 W.Va. 35, 183 S.E. 680 [ (1936) ];*State v. Beale,* 104 W.Va. 617, pt. 6 syl., 141 S.E. 401 [ (1927) ]. Most of the cases decided in West Virginia concerning the proof of the corpus delicti relate to establishing the death of the victim or to the existence of a criminal agency. *State v. Craig,* 131 W.Va. 714, 51 S.E.2d 283;*State v. Koontz,* 117 W.Va. 35, 183 S.E. 680;*State v. Lucas,* 103 W.Va. 743, 138 S.E. 393 [ (1927) ];*State v. Gilfillen,* 96 W.Va. 660, 123 S.E. 578 [ (1924) ];*State v. Roush,* 95 W.Va. 132, 120 S.E. 304 [ (1923) ];*State v. Merrill,* 72 W.Va. 500, 78 S.E. 699 [ (1913) ];*State v. Flanagan,* 26 W.Va. 116 [ (1885) ].

...

It is, of course, not indispensable to a conviction for murder that the wounds be the direct cause of death. It is sufficient if the initial wound caused the death indirectly through a chain of natural causes. Text writers in general take a uniform position on the effect of a pre-existing physical condition.

'It is equally well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed ... which rendered him unable to withstand the shock of the wound inflicted, and without which predisposed condition the blow would not have been fatal ...' 40 Am.Jur.2d, Homicide, Section 20, page 313.

It is immaterial that the accused did not know that the deceased was in a feeble condition which facilitated the killing. 'Responsibility for homicide attaches to one who accelerates the death of a person in poor physical condition ...' 40 C.J.S. *Homicide,* Section 11(d), page 855. See also 40 Am.Jur.2d, *Homicide,* Sections 15–16, pages 306–07.

It is also clear that foreseeability is not an element in the corpus delicti. Causation, as we consider it here, is not the type of causation involved in tort liability. It is not necessary that the defendant could have reasonably anticipated that her act would cause death. 40 C.J.S. *Homicide,* Section 11(d), page 856.

As can be gleaned from this discussion, the great weight of authority in this country holds a defendant criminally responsible where he inflicts a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or such treatment or effect of a pre-existing physical disability of the victim. We hold this to be the law of this State governing this case.

? 10

99 – AKA – Page 10

52

To hold, however, that the defendant in this case was responsible, we must find that the corpus delicti was established by direct evidence or by cogent and irresistible grounds of presumption and that such death was not due to natural or other causes in which the accused did not participate. *State v. Roush*, 95 W.Va. 132, 120 S.E. 304; *State v. Merrill*, 72 W.Va. 500, 78 S.E. 699.

The death of the victim must be proved by direct testimony or by presumptive evidence of the strongest kind, but the existence of a criminal agency as the cause thereof, can be established by circumstantial evidence and presumptive reasoning from the facts and circumstances of the case. *State v. Beale*, 104 W.Va. 617, 141 S.E. 401; *State v. Merrill, supra; State v. Flanagan*, 26 W.Va. 116.

*Durham*, 156 W.Va. at 515–20, 195 S.E.2d at 148–50 (1973).

In recognizing these principles of law, this Court held in *Durham* that the medical testimony can be characterized at

[729 S.E.2d 263]

least as circumstantial evidence relating to the cause of the death. *Id.* at 519–20, 195 S.E.2d at 150. The non-medical, circumstantial evidence on the question of causation was likewise properly presented to the jury. *Id.* The jury, thus properly instructed, had for its consideration direct and conclusive evidence of the death and competent circumstantial evidence that the defendant's criminal agency caused the death. *Id.* Accordingly, in *Durham*, this Court could not conclude that the jury was wrong. *Id.* at 518–20, 195 S.E.2d at 150–51. In so holding, the Court established the following two syllabus points:

In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death *indirectly through a chain of natural causes.*

*Id.*, Syl. Pt. 2. (Emphasis added).

A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or related to such treatment or effect of a pre-existing physical disability of the victim.

*Id.*, Syl. Pt. 3.

Petitioner suggests that this Court's opinion in *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998), a case involving felony murder with the underlying felony being "delivery of a controlled substance," is determinative for the purposes of the instant appeal. In *Rodoussakis*, the defendant raised two separate arguments regarding the failure of the State to prove its case against the defendant beyond a reasonable doubt. *Id.* at 64, 511 S.E.2d at 475. First, the defendant contended that the State's evidence was insufficient to trigger application of the felony murder statute. *Id.* Specifically, the defendant asserted that the felony murder statute did not apply in drug overdose cases. *Id.* The defendant argued that by using the word "murder" in W. Va.Code § 61–2–1, the Legislature intended that the felony murder rule apply only in cases of intentional death. *Id.* at 65 n. 3, 511 S.E.2d at 476, n. 3. In concluding that the defendant's intent, or lack thereof, to cause a drug overdose was not central to a consideration of whether the felony murder statute applied, this Court noted that "where a

11

*100*                                                                 53

homicide occurs in the course of, or as a result of, a separate, distinct felony, the felonious intent involved in the underlying felony may be transferred to supply the intent to kill necessary to characterize the homicide as murder." *Id.* at 65, 511 S.E.2d at 476, n. 3 (citing *State v. Young*, 173 W.Va. 1, 16–17, 311 S.E.2d 118, 134 (1983)) (emphasis added). Applying the clear and unambiguous language of W. Va.Code § 61–2–1 and the intent of the Legislature in enacting the statute, we held that

[p]ursuant to W. Va.Code § 61–2–1 (1991), death resulting from an overdose of a controlled substance as defined in W. Va.Code § 60A–4–401 *et seq.* and occurring in the commission of or attempt to commit a felony offense of manufacturing or delivering such controlled substance, subjects the manufacturer or deliverer of the controlled substance to the felony murder rule.

*Id.*, Syl. Pt. 3.


Next, the defendant in *Rodoussakis* argued that there was no evidence showing whether the morphine which actually caused the victim's death was delivered to the victim by the defendant, or whether it was self-administered without the defendant's involvement. *Id.* at 65, 511 S.E.2d at 476–77. However, this Court declined to address this specific assignment of error, finding that while the defendant sought relief below asserting that there was insufficient evidence that morphine, as opposed to other drugs in the victim's system, caused the victim's death, the defendant failed to argue below that there was insufficient evidence that the defendant's morphine, rather than the victim's own morphine, caused the victim's death. *Id.* at 65–66, 511 S.E.2d at 476–77. Thus, this Court concluded that the issue had not been appropriately preserved for purposes of appeal. *Id.* at 66, 511 S.E.2d at 477.

Here, Petitioner contends that the State's evidence did not sufficiently prove that the oxycodone caused C.C.J.'s death because Dr. Sabet did not offer any testimony as to which drug, the oxycodone or the valium, was the lethal or first effective drug, as he did in the *Rodoussakis* case. Petitioner points to the

[729 S.E.2d 264]

medical testimony presented by Dr. Sabet in *Rodoussakis,* where he opined that the cause of death was "multiple drug intoxication ... the first effective drug was morphine, the second alcohol, and the third cocaine." Dr. Sabet concluded that if the morphine were taken out of the victim's system, he would not have died when he did. Two other experts agreed with this conclusion. *Id.* However, as stated above, this Court did not consider the issue of whether there was sufficient evidence to prove that the defendant's act of delivering morphine to the victim caused the victim's death because the issue had not been properly preserved for purposes of appeal. Thus, we do not find *Rodoussakis* helpful in determining the issue before us.

Taking all of these prior decisions into consideration, we conclude in order to obtain a conviction for felony murder, all that the State was required to prove was that the death was simply *a result of* the delivery of the oxycodone. Nothing in our prior jurisprudence leads us to conclude that the State was required to prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death. Thus, we cannot say that the circuit court erred in determining that the evidence was sufficient to prove that C.C.J.'s death was the result of the delivery of the oxycodone by Petitioner.

In this case, the State presented evidence that Petitioner traded C.C.J.'s Jeff Gordon memorabilia collection for three oxycodone pills and that Petitioner delivered a pill to C.C.J.[6], which resulted in his death. The July 28, 2009 "Report of Death Investigation and Post–Mortem Examination Findings" issued by Dr. Sabet and Dr. Kaplan states that

*101*

12

"It is our opinion that [C.C.J.], a 14–year–old male teenager, died *as the result of combined oxycodone and diazepam intoxication* resulting in fatal hypoxic encephalopathy following a 5–day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions."

As to the manner of death, the report states,

"[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as Undetermined."

(Emphasis added).

While Dr. Sabet and Dr. Kaplan determined that the drugs found in C.C.J.'s blood were at a therapeutic levels, Dr. Sabet explained during his testimony at trial that a patient with cystic fibrosis may not be able to properly metabolize even a therapeutic concentration of these drugs. Shedding further light on his conclusions regarding the manner of death, Dr. Sabet offered the following testimony:

Q: Doctor, would you explain for us—in arriving at your cause of death, would you explain to the jury how, if at all, the presence of these controlled substances in this boy's body impacted or affected your ultimate conclusion in this case?

A: When you have multi-system organ failure, like the liver cirrhosis, pancreas, cystic fibrosis, lungs, he cannot breathe very well because of the mucous and other pathology findings that I cannot explain it here. And you see on the (unintelligible) examination, this person is defective, means he is—he cannot resist even normal concentration of drug. Even therapeutic concentration of prescribed drug could affect—could then metabolize or metabolize this drug from the system and could affect fatal consequence of this drug, even in normal persons like you and me.

Q: If—let me ask you this question and see if—see how this goes. Tell us, Doctor, looking at your report, which you have a copy of, what did you ultimately come to an opinion in terms of the cause of death and the manner of death?

A: Cause of death for this 14–year–old male teenager is combined oxycodone

[729 S.E.2d 265]

and diazepam intoxication, based on this organ failure, and cystic fibrosis associated with diabetes mellitus, which is what Type I is from the chart that he had, could be contributing factor to his death.

And manner is, because of the not therapeutic concentration of the oxycodone and Valium, and also (unintelligible) of reported caretaker's neglect to provide timely medical rescue, because based on the investigation that we received by the law enforcement, this father a few times rejected to take this teenager to the medical facility and even tried to treat in the tub with the ice or cold water.

These all could be contributing factors to his death. And manner of death is classified as undetermined, because we don't know really if this therapeutic drug concentration—I'm not hundred percent sure.

Thus, based on the fact that C.C.J. had a pre-existing condition, of which Petitioner was acutely aware, that rendered him unable to properly metabolize the oxycodone, and the medical experts' opinion that the cause of C.C.J.'s death was combined oxycodone and diazepam intoxication, we find that the evidence sufficiently established that the oxycodone in C.C.J.'s system resulted in his death. In *State v. Guthrie*, 194 W.Va. 657, 461

13

102                                                                              55

S.E.2d 163 (1995), this Court held that "[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted to trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.,* Syl. Pt. 1. When we review the evidence in this case in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime of felony murder proved beyond a reasonable doubt. Accordingly, we find no error with the circuit court's denial of Petitioner's motions for judgment of acquittal made during trial.

## 2) Delivery

In his second argument regarding the sufficiency of the evidence, Petitioner also alleges that the State failed to prove that he personally delivered the oxycodone to C.C.J. because no witnesses were presented that saw Petitioner give C.C.J. the pill. We accord this argument scant merit. At trial, Burdette provided testimony that although she never saw Petitioner give C.C.J. the third oxycodone pill that Petitioner got from Mr. Settle, Petitioner told her sometime after C.C.J.'s funeral that he felt responsible for C.C.J.'s death because he had "shot C.C.J. up with an oxycontin 30." The jury also heard evidence regarding several recorded phone calls between Petitioner and C.C.J.'s mother which could have led them to conclude that Petitioner delivered the oxycodone pill to C.C.J. Detective Sizemore obtained recorded telephone conversations which were admitted at trial between Petitioner and C.C.J.'s mother, Naomi Griffith, while she was an inmate at Lakin Correctional Facility. During one of the conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30." In another phone call he stated that he knew that C.C.J. had been obtaining drugs from "other places too."

In determining whether there is sufficient evidence to support a jury's verdict, "[a]n appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163. Assessing the above referenced evidence in the light most favorable to the prosecution, we find that the evidence was

[729 S.E.2d 266]

sufficient for a jury to conclude that the element of delivery of the oxycodone had been proven beyond a reasonable doubt.

## C. Jury Instructions

Next, Petitioner alleges that the jury was not properly instructed and that it was therefore confused in determining whether the felony had to cause the death or contribute to it. The circuit court adopted the State's instruction regarding felony murder without objection from Petitioner's counsel regarding the statement of law contained therein. The felony murder instruction that the jury received at trial, provided, in pertinent part:

You may, if warranted by the law and the evidence, return one of the following verdicts as to Count 1 of the indictment: Guilty of murder in the first degree, a felony, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of oxycodone, a controlled narcotic substance, with no recommendation of mercy; No. 2, guilty of murder in the first degree, a felony, as a result of the death of

103

14

[C.C.J.] occurring during the commission of the felony crime of delivery of oxycodone, a controlled narcotic substance with a recommendation of mercy; No. 3, not guilty.

Murder in the first degree is committed when any person in the commission of the delivery of a controlled substance causes the death of another person. Under the felony murder doctrine, murder in the first degree does not require proof of the elements of willfulness, deliberation, premeditation, malice or specific intent to kill. It is deemed sufficient in law if the death occurs during the commission of the delivery of a controlled substance.

Delivery of oxycodone, a Schedule II narcotic controlled substance, is committed when any person unlawfully and feloniously delivers oxycodone, a Schedule II narcotic controlled substance, to another person.

Before the defendant, Henry C. Jenkins, can be found guilty of murder in the first degree, a felony murder, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of a controlled substance, the State of West Virginia must prove beyond a reasonable doubt the following: That the defendant, Henry C. Jenkins, in Fayette County, West Virginia, on or about November 14, 2008, did deliver oxycodone, a Schedule II narcotic controlled substance, to [C.C.J.] and that [C.C.J.] died as a result of the defendant committing the crime of delivery of a controlled substance.

If you should find the defendant, Henry C. Jenkins, guilty of murder in the first degree, a felony murder, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of a controlled substance, you may, in your discretion, add to your verdict a recommendation of mercy.

During deliberations at trial, the jury passed a note to the bailiff with the following question: "Does the felony that was committed have to *cause* the death or *contribute* to it?" (Emphasis in original). The parties discussed at length whether the State was required by law to prove that the oxycodone caused C.C.J.'s death. In analyzing whether the instruction was a proper statement of the law, the circuit court noted that the felony murder statute does not contain the word "cause" or "contribute," rather it merely requires that the murder occur "in the commission of or attempt to commit the felony offense of delivering a controlled substance." The court also noted that West Virginia case law merely requires that "the initial felony and the homicide are parts of one continuous transaction, and are closely related of point in time, place and causal connection," *see* Syl. Pt. 2, in part, *State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480, and "the death of the victim as a result of injuries received during the course of such commission or attempt." *See* Syl. Pt. 5, in part, *State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219. Thus, the court decided that because the words "cause" and "contribute" were not an accurate reflection of the law, it would not re-read the previous instruction to the jury that the delivery of oxycodone had to cause the death.

The State then proposed that as an alternative, the court could simply read the language

[729 S.E.2d 267]

contained in the felony murder statute instead. Petitioner's counsel objected and stated that the instruction that was read to the jury was the State's proposed instruction, not Petitioner's, and that the language used in that instruction is what the defense relied upon in its argument to the jury. Taking this into consideration, Petitioner's counsel suggested that it would be best to leave the issue alone and simply write a note to the jury stating that the court could not answer the question, as the jury had already heard the court's instructions. After the parties had opportunity to review and agree to the language contained therein, the judge returned a note to the jury stating

Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court.

*109*

They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may not continue to deliberate toward verdicts in this case.

When we review the record and consider the series of events that occurred before the circuit court, we find that Petitioner has waived any argument that the court committed error in not providing further clarification on the issue of causation. Petitioner's counsel was the one who actually suggested that the court not answer the jury's question. Accordingly, Petitioner is foreclosed from claiming that this tactical decision was erroneous. Although the jury instruction admittedly confused the jury as to whether causation was required to prove felony murder, Petitioner was not prejudiced by having this instruction read to the jury. Even if the jury had inferred that the State had to prove that oxycodone itself "caused" the death of C.C.J., this would have been a heavier burden of proof for the State to carry to obtain a conviction. If anything, the instruction inured to the benefit of Petitioner.

### D. Suppression of Petitioner's Statement

Petitioner next contends that the circuit court's decision to suppress his statement only for purposes of the State's case in chief was erroneous. Detective Sizemore and Detective Ron Perdue went to the home of Petitioner on May 27, 2009, to interview Petitioner. Based on the investigation and the statements of other witnesses, Detective Sizemore had obtained a warrant for Petitioner on May 22, 2009. Detective Sizemore testified that at the interview on May 27, 2009, he read Petitioner his Miranda rights. The interview took place outside Petitioner's house and the parties apparently chatted amiably and smoked cigarettes along the road. The detectives never informed Petitioner of whether he was under arrest, or whether he was free to leave.[2] Petitioner was not placed in handcuffs during the interrogation, but was arrested immediately after the interview. Detective Sizemore admitted that he had the arrest warrant in his pocket during the interview.

Following a hearing on Petitioner's motion to suppress the statement, the circuit court concluded that the purpose and manner of conduct of the interview was to induce a statement, and thus suppressed the State's ability to utilize the statement in its case in chief. The court, however, denied the defense motion to prohibit the use of the statement for any purpose at trial and allowed its use on rebuttal to impeach Petitioner should he choose to testify at trial. Petitioner contends it was error for the circuit court to permit the use of this statement for impeachment purposes. Specifically, he contends that the court's ruling deterred him from testifying and thus, severely prejudiced his case. The State responds that although the circuit court's ruling permitted the statement

[729 S.E.2d 268]

to be used on rebuttal for the limited purpose of impeachment, the State did not use the statement during the trial for any purpose out of an abundance of caution. Thus, it contends that Petitioner fails to demonstrate any prejudice caused by this ruling.

We find no error in the circuit court's ruling. As this Court explained in *State v. Goff,* 169 W.Va. 778, 289 S.E.2d 473 (1982), examination of a confession involves two distinct voluntariness inquiries. Where a confession is obtained in violation of *Miranda,* it is involuntary in law and is inadmissible in the State's case. *Id.* at 782, 289 S.E.2d at 476. The confession may, however, be used to impeach the defendant's trial testimony, provided it was not the product of improper coercion. *Id.* at 782–83, 289 S.E.2d at 476. We stated the applicable rule in Syllabus Point 4 of *State v. Goodmon,* 170 W.Va. 123, 290 S.E.2d 260 (1981):

Where a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes

*105*

16

**EXHIBIT—MENTAL HISTORY**

# [EXHIBIT-MENTAL HISTORY]

106

## PERTINENT FACTS OF MENTAL HEALTH ISSUES

Petitioner/Defendant, Edward Jess Dreyfuse does in fact have an extensive History of Menatl Health Issues, Those being;

1) Petitioner was hospitalized on 4 seperate occaisions for attempted Suicides before his 15 th Birthday, the 1st time being at age 9 for an intentional overdose of 120 primatine asthma pills where there was hospitilization at Todds Childrens Hospital, Youngstown, Ohio.

2) Petitioner was an Abused Child and underwent brutal torture, and in fact his Biological Mother was convicted for such when she had went so far as to break BOTH of the Petitioners arms at age 8 by beating the Petitioner with a club, she was Sentenced to 5 years in Muncy State Prison for women in 1974 and the Petitioner was placed in Foster Care for nearly a year under supervision of the Penn. Dept. of Child Welfare, Case Worker, Sandy Copper.

3) Petitioner was sent to live with his Biological Father at age 9, where he once again suffered severe Physical and Psychological abuse, and Petitioner began attempting Suicide as a result.

4) Petitioner did run away from his Father's house on his 12th Birthday 6/11/78, and Hitch Hiked to Florida, eating from Dumpsters and sleeping beside them until his Capture and return to his Father in New Castle Pennsylvania.

5) Petitioner's being abused had again escalated to where the School Officials of Ben Franklin Jr. High called in Sandy Copper of the Penn. State Child Welfare Dept. because the Petitioner was beaten so severely that both his eyes were swollen comletely shut, lips were split, ears were collerflowered and bruising suggested near Fatality.

6) Petritioner ran away 5 times from his father from age 12 to 15

7) Petitioner had a Case Worker named Robin Martwinski in Lawrence County, Pennsylvania.

107

8) Petitioner was placed in a Juvenile Facility and at age 16 was released and emancipated, the Petitioner did NOT return to his Fathers House and was in fact on his own since placement at age 15.

9) Petitioner then returned to Florida, and was in fact Homeless for numerous years, and was placed in numerous Mental Facilitites for Suicide Attempts throughout his Adult life.

10) Petitioner attempted suicide by using a Long Rifle belonging to his ex wife, Rachelle Dreyfuse.

11) Petitioner did in fact attempt suicide in 1995 by stabbing himself so severely he required surgery, this was in Meigs County Ohio.

12) Petitioner did in fact attempt suicide in Cabell County W.VA.in the exact same manner of Stabbing at a Hotel located on the West End of Huntington and is a matter of record with City Police.

13) Petitioner has attempted suicide MORE than 10 times from his 17th Birthday to present date.

14) Petitioner was treated for mental health Issues and medicated.

15) Petitioner did in fact explain to Attorney LAishley that he has suffered a severe mental illness from age 8 and asked that he be given a Psychological Evaluation.

16) Attorney Laishley told the Petitioner that the Judge would NEVER allow a Psychological Evaluation and refused to motion the Court for such after being made aware of the extensive mental Issue(s) and History of such.

17) Petitioner was placed on suicide watch while awaiting Trial, as a Result of such, Attorney LAishley told the Petitioner he would kill himself if he was in the Petitioner's shoes.

2

108

18) Petitioner was in fact a child of two alcoholics who were Abusive Physically and Mentally and subjected the Petitioner to forms of torture as a child that were unbearable.

19) Petitioner was proclaimed by the State to be a Homeless Alcoholic who was Addicted to drugs that lived on the Banks of the Ohio River that allegedly attacked a complete stranger in a residence never before frequented by the Petitioner so as to intentionally murder the unknown stranger(Victim) in a fit of black Rage that was drug and OR alcohol induced, However, even at that being obvious to ANYONE, even a non professional, Attorney John "JACK" Laishley did NOT motion the Court for a Psychological Evaluation, and in fact REFUSED to motion the Court for such.

20) Attorney Laishley Refused to and failed to investigate all of the aforementioned Mental Issues and refused to make the Court aware of the pre existing Mental Issues that are Epic in actual Record and are substantial in the ineffective Assistance of Counsel provided, as any reasonable Attorney would have certainly investigated and also presented the aforementioned Psychological History to the Court for a Menatl Evaluation to be conducted according to law so as to establis Competency of the Petitioner/Defendant, BOTH during the actual Criminal event, and at the time of trial.

21) ALL of the claims made herein are matters of RECORD, and are able to be obtained for presentment, as they should have by Attorney Laishley.

22) There exists a total of 15 documented Suicide attempts that were severe in nature as to require surgeries on 8 seperate accounts.

*109*

## History of Hospitalization(s) Treatment

Todds Childrens Hospital, Suicide Attempt-Overdose, Youngstown Ohio

Hamot Medical Center, Suicide Attempt- Overdose, Erie Pa.

Jameson Hospital, Suicide Attempt-Overdose, New Castle Pa.

Lawrence County Mental Health Dept.-Hanging Attempt, New Castle Pa.

Lawrence County Dept. Child Welfare-Sandy Copper, New Castle Pa.

Westwwod Hospital, Suicide Attempt, Vehicle, Ft.Pierce Fla.

Vision Quest Inc, Psych Treatment, Franklin Pa.

Ellwood General Hospital, Suicide Attempt, Vehicle, Ellwood City Pa.

Psych Hospital, Sebastian-Suicide Attempt, By Police, Sebastian Fla.

Vetrans Memorial, Suicide Attempt, Stabbed self, Middleport Ohio.

Westmoreland Psych Treatment, Mason W.Va.

Beaver Valley Medical Center, Suicide Attempt, Overdose Alcohol, Beaver Pa

St Mary's Medical Center, Suicide Attempt, Stabbed self, Huntington,W.Va.

Ohio Valley Medical Center, Suicide Attempt alcohol, Wheeling W.Va.

New Martinsville Hosp, Suicide Attempt, Gunshot, New Martinsville, W.Va.


A mental/Psychological History as evidenced by the above would cause any reasonable Attorney to Motion a Court for a Psych Eval as well as constitute a thorough Investigation into such a History of seroius Psychological problems, the above are verifiable and have began at Age 9 and are to recent Date, minus a Suicide Attempt at the Western Regional Jail while awaiting Trial, which Attorney Laishley was also aware of but REFUSED to inform the Court of such.

1

*110*

Psych Records Available

Lawrence County Dept. Child Welfare, New Castle Pa.
Todds Childrens Hosp. Youngstown Ohio.
Lawrence County Juvenile Services, New Castle Pa.
Lawrence County Mental Health Dept. New Castle Pa.
Jameson Memorial Hosp. New Castle Pa.
Vision Quest Inc. Franklin Pa.
Hamot Medical Center. Erie Pa.
Ellwood General, Ellwood City, Pa.
Sebastian Psych Hosp. Sebastian Fla.
Veterans Memorial Hosp. Middleport Ohio.
Beaver Valley Med Center, Beaver Falls Pa.
St. Mary's Med Center, Huntington, W.Va.
OVMC, Wheeling, W.Va.
U.S. Social Security Admin. Washington, D.C.
Dr. Sirus Arya, Huntington, W.Va.
Dr. Westmoreland, Mason, W.Va.
Dr. Shackleford, Wheeling, W.Va.
Dr. Boni, Wheeling, W.Va.
Dr. Schaffer, Williamson, W.Va.


There are many other Doctors which have treated the Petitioner and there should be records of such at various Facilities and places for treatment, Including Rehab(s) that are not lisred at this time.

A Psychological History as evidenced by the above would cause any reasonable Attorney to Motion the Court for a Psych Eval as well as constitute a thorough Investigation into the History of Psych Problems, However, this was NOT presented to the Court NOR was it Investigated as the record clearly shows NO Investigation was ever preformed into the Issue(s) of Competency OR Psychological disorder(s) or the History of such.

2

ℓ ℓ ℓ

# [EXHIBIT MANDAMUS]

EXHIBIT–MANDAMUS



# SUPREME COURT OF APPEALS

### OFFICE OF THE CLERK

STATE CAPITOL, ROOM E-317
1900 KANAWHA BOULEVARD, EAST
CHARLESTON, WV 25305
PHONE: (304) 558-2601
FAX: (304) 558-3815
WEB: WWW.COURTSWV.GOV

CLERK OF COURT
RORY L. PERRY II

DEPUTY CLERK
EDYTHE NASH GAISER

SENIOR STAFF ATTORNEY
ADRIANA MARSHALL

STAFF ATTORNEY
JORDAN E. MARTIN

August 5, 2016

Edward Dreyfuse
Northern Correctional Center
112 Northern Reg. Correctional Drive
Moundsville, WV 26041

Mr. Dreyfuse:

We received your document entitled "Petition for Writ of Habeas Mandamus." The relief you requested in this matter is the same as the relief sought in Case No. 16-0301. This case constitutes a successive petition and will not be docketed. Therefore I am returning your documents to you.

Sincerely,

Redonna Thompson
Assistant Clerk

113

# PETITION FOR WRIT OF HABEAS MANDAMUS

EDWARD JESS DREYFUSE,

      Petitioner,

V.                                            **UNDERLYING CASE NO.: 12-F-232**

HONORABLE PAUL T. FARRELL,

      Respondent,

      In the matter of the Petitioner's Pending Habeas Corpus Petition being Suspended and his right(s) to Due Process of Law being Denied and Delayed by the Respondent in violation of;

**The Due Process Clause, Article III, Section 10 of the West Virginia Constitution,**

**Article III, Section. 4 of the West Virginia Constitution,**

**United States Constitution, Article I, § 9,**

**West Virginia Trial Court Rules. Trial Court Rule 16.06,**

**West Virginia Constitution. article. III, § 17,**

**W. Va. Code Jud. Conduct Canon 3A(5);**

As presented and Cited herein.

1 (4j

## IN THE WEST VIRGINIA SUPREME COURT OF APPEALS

EDWARD JESS DREYFUSE,

       Petitioner,

V.                                   CASE NO.:

HONORABLE PAUL T. FARRELL,

       Respondent,

### PETITION FOR WRIT OF MANDAMUS

Comes now your Petitioner, Edward Jess Dreyfuse, Pro Se, Moving this Court by Petition, pursuant to **W.Va. Code Annotated Rules of Appellate Procedure, Rule 21.** Writs of mandamus and prohibition, and other extraordinary writs.

As between mandamus and prohibition, prohibition is the preferred and more appropriate remedy to challenge the actions of a trial court when the allegation is that the trial court was without jurisdiction or was acting beyond its legitimate powers. This is the statutory language in **W. Va. Code § 53-1-1** : A writ of mandamus will not issue unless three elements coexist: **(1)** a clear legal right in the petitioner to the relief sought; **(2)** a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and **(3)** the absence of another adequate remedy. Mandamus will not be denied because there is another remedy, unless such other remedy is equally beneficial, convenient and effective.

Mandamus is a proper remedy to require the performance of a nondiscretionary duty by various governmental agencies or bodies. Syl. Pt. 1, **State ex rel. Allstate Ins. Co. v. Union Pub. Serv. Dist.**, 151 W. Va. 207, 151 S.E.2d 102 (1966).

115

A writ of mandamus will not issue unless three elements coexist - **(1)** a clear legal right in the petitioner to the relief sought; **(2)** a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and **(3)** the absence of another adequate remedy." Syl. Pt. 2, **State ex rel. Kucera v. City of Wheeling**, 153 W. Va. 538, 170 S.E.2d 367 (1969).

## RELEVENT FACTS AND PERTINENT ISSUES

**1)** Petitioner filed a Petition for Writ of Habeas Corpus on 1/4/2016 in Cabell County West Virginia

**2)** Petitioner's Habeas Corpus Petition is suspended and under stay due to pending Civil Actions in the United States District Court, Southern District, where Petitioner has proceeded against Judge Paul T. Farrell.

**3)** Petitioner has filed BOTH Writs of Prohibition and Mandamus relating to the above styled Issues without relief.

**4)** Petitioner is suffering the Denial of Numerous Constitutional Rights by the delay being had by Judge Farrell's not recusing himself and suspending the Petitioner's Habeas Proceedings until a final deposition is had in the Pending Federal Action(s) which may in fact take years until finality due to the complex issues being litigated.

116

**LEGAL RELEVENT STANDARDS**

**West Virginia State Constitution § 17. Courts Open to All — Justice Administered Speedily;** The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

It is misconduct for a judge to unreasonably delay resolving a case. Under **W. Va. Const. art. III, § 17,** which provides that justice shall be administered without sale, denial or delay, and under **W. Va. Code Jud. Conduct Canon 3A(5)** , which provides that a judge should dispose promptly of the business of the court, judges have an affirmative duty to render timely decisions on matters properly submitted within a reasonable time following their submission.

This Court has also pointed out that "judges have an affirmative duty to render timely decisions on matters properly submitted within a reasonable time following their submission." Syllabus point 1, in part, **State ex rel. Patterson v. Aldredge**, 173 W. Va. 446, 317 S.E.2d 805 (1984). The duty of judges to issue timely decisions is also clearly set forth in **the West Virginia Trial Court Rules. Trial Court Rule 16.06** directs that in Domestic Relations Proceedings "[A]n order shall be entered on post-hearing motions within one month of submission."

Pursuant to **Trial Court Rule 16.13** it is the duty of the judges to effectuate expeditious movement and timely disposition of all cases assigned to them.

The post-conviction remedy sought by the petitioner is specifically provided for in **West Virginia Code § 53-4A-1** et seq., and is further guaranteed by **West Virginia Constitution, Article III, § 4**: "The privilege of the writ of habeas corpus shall not be suspended.

117

The Due Process Clause,  **Article III, Section 10 of the West Virginia Constitution**, requires procedural safeguards against State action which affects a liberty or property interest." Syllabus Point 1, **Waite v. Civil Service Commission,** 161 W. Va. 154, 241 S.E.2d 164 (1977). Due process of law means "the due course of legal proceedings according to those rules and forms, which have been established for the protection of private rights, securing to every person a judicial trial before he can be deprived of life, liberty or property." Syllabus Pont 8, **Peerce v. Kitzmiller,** 19 W. Va. 564 (1882).

In addition to its common law roots, the writ of habeas corpus acquired constitutional dimensions in the sense that its privilege cannot be suspended by the Federal government except in certain extreme cases.  **United States Constitution, Article I, § 9, cl. 2. 3** In this State the privilege of the writ is even more absolute as "the privilege of the writ of habeas corpus shall not be suspended." West Virginia Constitution, **Article III, Section 4**.  Finally, **under Chapter 53, Article 4A, Section 1 et seq. of the West Virginia Code** , as amended, certain procedural modifications have been made in regard to the courts' jurisdiction of the writ.

The United States Supreme Court has made it clear that the writ of habeas corpus, because of its broad availability to challenge confinement contrary to the Constitution, cannot be limited to a particular {239 S.E.2d 141} form of remedial relief.  **Prieser v. Rodriguez,** supra; 5 **Peyton v. Rowe**, 391 U.S. 54, 20 L. Ed. 2d 426, 88 S. Ct. 1549 (1968); **Irvin v. Dowd**, 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961).

Furthermore, the State may not deprive prisoners . . . of their right to habeas corpus review of the legality of their confinement[.]" Syl. pt. 1, in part**, Tasker v. Griffith**, 160 W. Va. 739, 238 S.E.2d 229 (1977). See also  State ex rel**. Titus v. Hayes**, 150 W. Va. 151, 159, 144 S.E.2d 502, 508 (1965) ("The primary object of habeas corpus is to determine the legality of the restraint under which a person is held[.]");

*108*

**State ex rel. Nutter v. Mace**, 130 W. Va. 676, 44 S.E.2d 851 (1947) ("If the process or proceeding under which the complaining party is confined or restrained is void a writ of habeas corpus is the proper remedy to invoke."). Indeed, pursuant to Art. 3, Sec. 4 of the state constitution, it is held that "the privilege of the writ of habeas corpus shall not be suspended." See **Rhodes v. Leverette**, 160 W. Va. 781, 787, 239 S.E.2d 136, 140 (1977) ("In this State the privilege of the writ is even more absolute as 'the privilege of the writ of habeas corpus shall not be suspended.'");

**State ex rel. Burgett v. Oakley,** 155 W. Va. 276, 279, 184 S.E.2d 318, 320 (1971) ("The writ of habeas corpus is . . . guaranteed by both the federal and State Constitutions."); **State ex rel. Nutter v. Mace**, 130 W. Va. 676, 685, 44 S.E.2d 851, 855 (1947) (Fox, J., dissenting) ("Thus we have the writ so firmly established in our law that it cannot be repealed or suspended by our State Legislature[.]"); **Ex parte Jones**, 71 W. Va. 567, 610, 77 S.E. 1029, 1047 (1913) (Robinson, J., dissenting) ("The people ordained that the privilege of the writ of habeas corpus should never under any circumstances be suspended.").

## CONCLUSION/RELIEF(S) SOUGHT

Petitioner herein prays that this Honorable Court GRANT the Petition as it has been offered by the presentment of a Writ of Mandamus and offers the following in support of meeting the requirements for the Court to GRANT this Petition;

(1) a clear legal right in the petitioner to the relief sought; that being the Constitutional Right to file a Petition for writ of Habeas Corpus and that justice shall be administered without sale, denial or delay, and also as the privilege of the writ of habeas corpus shall not be suspended.

(2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; that being the Recusal of Judge Paul T. Farrell from deciding the Petition for Writ of Habeas

169

Corpus in which Petitioner filed more than 6 months ago and has been wrongfully

Suspended and Delayed by Judge Farrell in direct Violation of ALL of the Relevant Legal

Standards presented.

**(3)** The absence of another adequate remedy; The Petitioner herein offers this

Petition for decision to the Honorable West Virginia Supreme Court of Appeals as no other

remedy is available since his Petition for Writ of Habeas Corpus is under an illegal suspension

and stay which is denying the Petitioner his Constitutional right(s) of Due Process of Law and

Equal Protection of such.

Petitioner herein prays this Honorable Court will GRANT the Petition as it is offered and ORDER

that Justice be served without Delay, Denial or the Suspension of the Petitioner's Habeas Corpus

Petition Pending in Cabell County West Virginia, and also ORDER Judge Paul T. Farrell to excuse himself

from deciding ANY Case or Action which involves the Petitioner, and should Judge Paul T. Farrell NOT

remove himself from the Petitioner's pending Habeas Petition, have him show cause as to why the

Petitioner should be denied the right to Due Process and the Suspension of his right to a Habeas Corpus

proceeding as guaranteed by the Due Process Clause, **Article III, Section 10 of the West Virginia**

**Constitution, Article III, Sec. 4 of the state constitution, and United States Constitution, Article I, § 9,**

Petitioner, Pro-Se

Sworn to, Taken and Affirmed before me on, _207 July_ 2016, In Marshall County, W.Va.,

NOTARY PUBLIC

My commission expires, _05 August 2020_



_126_

**EXHIBIT–AFFIDAVIT**

## AFFIDAVIT

1.) My name is Edward "Jesse" Dreyfuse, and I have personal knowledge of the matters contained Herein.

2.) I was charged with Murder and Burglary, along with two counts of Assault during the Commission of a Felony and Two counts of Brandishing the Two counts of BOTH brandishing and assault during the commission were dismissed by the Court, I went to trial for the Murder and the Burglary charges.

3.) I was represented by John "JACK" Laishley, Esq. in this Case.

4.) Prior to Trial I asked the Court to remove Mr. Laishley from my Case, The Court denied my request stating to the effect that Attorney Laishley Had money invested in my Case and that He was a capable Lawyer.

5.) Prior to Trial I asked the Court to Appoint Co-Counsel, The Court denied this request for the same reason.

6.) Mr. Laishley retained a Private Investigator, Greg Cook, to assist in my Case, and informed me that He was my Co-Counsel, He just didn't have a degree in Law.

7.) Prior to Trial I spoke with Mr. Laishley and Mr. Cook about several things that supported the fact that I was beaten with a bat, stabbed and Robbed by Several of the State's potential witnesses who were prepared to testify that I attacked the victim, whom I have NEVER met, in the exact same manner as they attacked me.

8.) I told Mr. Laishley and Cook that imediately after I was attacked I ran to Go-Mart, 3 houses away, to get to the safety of light and a Public Place, I explained in detail to the Night Clerk how I had been attacked and Robbed and spent approxamately 10 Minutes with the Clerk as would be evidenced by security Video.

<u>9.)</u> To my knowledge, Neither Mr. Laishley Nor Mr. Cook ever investigated this lead.

<u>10.)</u> To my knowledge, neither Mr. Laishley Nor Mr. cook supeonaed VIDEO footage from Go-Mart, which would have shown that I was in a Bloody, Beaten state, and would have also had AUDIO of the actual conversation between myself and the night Clerk wherein I explained in detail how I was attacked, Robbed and Stabbed and of my escape.

<u>11.)</u> I also told Mr. Laishley and Mr. cook that PRIOR to the incident, me and an old Girlfriend made the decision to reconcile and that she was supposed to come to Huntington to pick me up  the night BEFORE the incident, however her car had broke down and she could not make it down, this was Pre-arranged so there was NO intent of flight...

<u>12.)</u> I told Mr. Laishley and Mr. Cook that I called "Karen" (Old Girlfriend) and told her the details of my being attacked and Robbed soon after my arriving back to my apartment, where I was assisted in treating the wounds of being Stabbed and beaten.

<u>13.)</u> To my knowledge neither Mr. Laishley nor Mr. Cook ever attempted to contact "Karen" nor did they ever subpoena her to testify.

<u>14.)</u> In a telephone conversation with "Karen" from the Jail "Karen" made it clear that neither Mr. Cook or Laishley ever attempted to contact her, AND that she had called the Office of Mr. Laishley repeatedly and was constantly told that Mr. Laishley would retern her call, which NEVER happened.

<u>15.)</u> I told Mr. Laishley and Mr. cook that a friend, Duane Conners Came to Huntington to pick me up and drive me back to Parkersburg to "Karen's" as was previously arranged, and that I related to Duane the details of the attack, Robbery and Stabbing.

<u>16.)</u> I told Mr. Laishley and Mr. Cook that I had called my Daughter,

122

23

Denise Thompson, and discussed my being Robbed, beaten and Stabbed, to my knowledge they never attempted to contact her either, nor did they subpoena her to testify.

17.) I ttold Mr. Laishley and Mr. Cook that I had called my estranged wife and discussed in DETAIL the events of my being attacked, Robbed and stabbed and narrowly escaping, to my knowledge neither Mr Cook nor Mr. Laishley ever attempted to contact her, nor did they subpoena her to testify.

18.) I told Mr. Laishley and Mr. Cook that I called my sister in Law, Kim Rial, and explained in DETAIL the events that transpired and of my being attacked, Robbed, Stabbed and Beaten, once again, neither Mr. Cook Nor Mr. Laishley ever attempted to contact her, Nor did they subpoena her to testify.

19.) I told BOTH Mr. Laishley and Mr.Cook that ALL of the above mentioned calls took place the morning of the attack, approx began to make calls at 07:00, 7:00 AM, and requested that He subpoena phone records to establish the FACTS of such, to my knowledge neither Mr. Laishley nor Mr. Cook ever subpoenaed those calls.

20.)To my knowledge, Neither Mr. Cook nor Mr. Laishley EVER attempted to contact ANY of the witnesses I mentioned Nor did they ever investigate my CLAIMS nor did the subpoena ANY witnesses to support my Defense.

21.) I also told BOTH, Mr. Laishley and Mr. Cook that I had informed the Wood County Deputies that arrested me that I was Beaten, Robbed and stabbed, and was a victim of such an attack that occured in Huntington, and also made them aware of the Injuries I had by such attack, Officer's names are, Sgt. Allen and Deputy Swiger.

123

22.) To my knowledge neither Mr. Laishley nor Mr. Cook attempted to contact the Deputies that I had made the statement(s) to, nor did they subpoena either Deputy, or present my statement to the Deputies as evidence at Trial.

23.) At Trial Mr. Laishley did NOT cross examine Deputy swiger in regards to my Statement(s) nor did he raise the issue of such.

24.) Discovery released to Mr. Laishley and Mr.cook contained actual Audio recorded statements made by State's witness "Blondie", Lilly Collins where she clearly stated that, "STAN KILLED JUNIOR", and that "STAN ROBBED THAT JESSE GUY", and also that "STAN HAD MONEY THE MORNING RIGHT AFTER THE ATTACK" and "THAT STAN GAVE JAMES MONEY THE SAME MORNING"...

25.) Mr. Laishley **NEVER** mentioned these Statements or attempted to enter them as to prove that there existed exculpatory statements and neither did he attempt to IMPEACH "Blondie's" testimony with the recorded statements.

26.) Another existing Audio recorded Statement made by James Marcum to Detective stinnent Clearly described the person who allegedly attacked the Victim, Mr. Clay, as being 6 foot 4 inches tall, and weighing approxamtely 270 pounds, I am 5 foot 11 inches tall and only weighed 180 pounds at the time of this event.

27.) Once again, Mr. Laishley never attempted to mention this statement, nor did He try to enter it to the record or attempt to Impeach the state's witness James marcum with this description given to the detective as to the person who "attacked" the Victim.

28.) Mr. Laishley never objected to ANY leading testimony that was being had by Chris Chiles, He actually sat quietly and allowed it.

129

**29.)** Mr.Laishley **NEVER** objected to the State's knowing use of Perjured testimony being had by the State's witness, james marcum in his testifying that "he seen junior get his brains beat out of his head" and that" He actually cleaned up Brains after the eventt" and that the "BAt he was identifying"" was used to beat juniors Brains out of his head", Not only was this testimony allowed to pass unchallenged it was allowed to be exploited by the Prosecution and Mr. Laishley was well aware of the FACT that the Victim had NEVER suffered any type of Head injury that was severe as to the exposure of any brain matter... yet He allowed such Perjured testimony to pass unchallenged.

**30.)** Prior to trial, while preparing to strike Jurors the State had made a final Plea Offer, the gist was that I enter a guilty OR a No Contest Plea to 2Nd degree Murder in return for a 30 year FLAT sentence and the State would dismiss the Burglary and NOT seek the recividist enhancement.

**31.)** at that time Attorney Laishley had me convinced that I had 2 Defenses, Firstly that I did not attack, assault or EVER see the victim and that I was in fact a victim myself and suffered the same type of injuries as the victim, and (2) Assuming that the jury did not accept the fact that I did NOT inflict injuries that were a direct cause of deat to the victim , I could NOT be found guilty, since the actual cause of death was by Cadiac Arrest, not from being beaten as ALL evidence PROVED.

125

32.) In this regard, Mr. Laishley had advised me when the Plea offer was pending that I could not be found guilty of Murder unless the State could prove beyond a reasonable doubt that I had inflicted injuries to the Victim, and that those INJURIES DIRECTLY caused the Death of the Victim.

33.) The Medical evidence in this Case was undisputed, The Victim did **NOT** die directly as a result of injuries inflicted by ME or ANYONE else, instaed the uncontoverted Medical Evidence established the Victim suffered a Heart Attack during an Orthopedic procedure which was necessetated by the victim being beaten.

34.) The way Mr. Laishley explained it to me prior to trial, When the Plea Offer was pending, The state could NOT establish it's burden on the Murder charge, even if the Jury thought I had struck the victim with a bat, So that meant I was looking at a Burglary charge ONLY, with a 1 to 15 year possible prison sentence, Where a No Contest Plea to 2nd degree Murder would have subjected me to a determinate prison term of 30 years Flat.

35.) On that basis I rejected the state's Plea Offer, and proceeded to trial.

36.) After the close of evidenceat trial, which included my testimony, the Court was prepared to issue Jury instructions to the Jury, at this point, the State proposed a So-Called "Jenkins" instruction this instruction was a complete surprize because it was EXACTLY the OPPOSITE of what Mr. laishley had advised to me, according to the "Jenkins" instruction, the Jury could convict me of Murder if it believed that the victim died INDIRECTLY of being beaten, simply by being on an operating table and having a Heart Attack, which IS EXACTLY what happened according to ALL of the Medical Evidence

126

27

And the Expert testimony at trial, including MY expert, and **ONLY** Defense witness, Dr. Touchan, This was completely at odds with mr. Laishley's advice to me, as he ENCOURAGED this TESTIMONY to be given to the Jury by my expert witness, Dr. Touchan in my DEFENSE, I realized at this point that my DEFENSE was NOT a Defense to Murder at all, assuming the Jury did not believe me and my UNCORROBERATED version of events, in the face of the state's witnesses who claimed that I attacked the victim.

<u>37.)</u> I was NOT allowed to take the Plea at this point, as the state had withdrawn it's Offer when the Trial began.

<u>38.)</u> I can STAE unequivically that I would have **CERTAINLY ACCEPTED** <u>the State's Plea offer</u> If Mr. Laishley would have CORRECTLY advised me about the **"JENKINS"** Charge and instruction.

My reasoning is that the jenkins instruction virtually GURANTEED a guilty verdict of 1St degree Murder, If the Jurors believed that I attacked the victim, and there were 2 people who testified to this fact, The verdict exposed me to a LIFE sentence, and due to the nature of the victim's Death, I also realized that I faced a probable outcome of a recomendation of "no mercy" from the Jury, which is EXACTLY what happened.

But I was not worried about this scenerio at all PRIOR to the Court giving the "Jenkins" instruction, Because Mr. Laishley claimed that the state had to prove that the INJURIES INFLICTED by a bat(assuming thought I had inflicted them) HAD to be the DIRECT cause of death and it was UNCONTESTED, Medically, that this did NOT occur.

127

I realize that this sounds like buyers remorse, but I would have never taken a chance like that with my life if Mr. Laishley would have properly advised me that the Court could OR would issue the "Jenkins" instruction, by that time however, the offer was not on the table, I knew that my whole Defense, which consisted of only my testimony and the testimony of Dr.Touchan, who told the Jury that the victim did die from a heart attack was doomed by Attorney Laishley NOT knowing the law.

**39)** On a related note, I was very disappointed that Attorney Laishley did not adequately investigate the history of severe mental disorders or subpoena witnesses, evidence, video and the likes that proved my version of the events, that being I was a victim of an assault and robbery, instaed Attorney Laishley allowed 7 state's witnesses to be paraded on the stand and led around unchallenged, and in fact allowed the State to knowingly present falsified, fabricated, fraudulent, perjured testimony... he NEVER attempted to object to this... It was as if he went from a Defense Lawyer to a Prosecutor in a blink of an eye.

I can not blame the jury for not believing my unsupported testimony, especially since Attorney Laishley did not present any witnesses,evidence, testimony...nothing to support my version of the events.

FURTHERMORE THE AFFIANT SAYETH NAUGHT

_____
Affiant

Sworn to, Taken and Affirmed before me on, 16 /Aug /2016, In Marshall County, W.Va., _____

NOTARY PUBLIC

My commission expires 05 /Aug /2020

128


OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
KENNETH E. POWELL, III
Northern Regional Correctional Facility
112 Northern Regional Correctional Drive
Moundsville, West Virginia 26041
My Commission Expires Aug. 5, 2020

U.S. DISTRICT COURTS ORDER

EXHIBIT-COURTS ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

EDWARD JESS DREYFUSE,       )
                                  )
      **Petitioner,**        )
**v.**                              )      **Civil Action No. 3:16-06717**
                                  )
**KAREN PSZCZOKOWSKI, Warden,** *et al.,*  )
                                  )
      **Respondents.**     )

### O R D E R

On July 22, 2016, Petitioner, acting *pro se* and incarcerated at Northern Regional Jail, filed his "Application and Affidavit to Proceed Without Prepayment of Fees" (Document No. 1) and "Motion for Stay and Abeyance" (Document No. 2). In his "Motion for Stay and Abeyance," Petitioner requests that his Section 2254 Petition be stayed and held in abeyance. (Document No. 2.) Petitioner, however, has not filed a Section 2254 Petition with this Court.

The undersigned notes that *habeas* petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 66 (1994). The petition must "set forth in summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the Rules Governing Section 2254 Proceedings in the United States District Courts. "[N]otice pleading is not sufficient [in federal *habeas corpus*], for the petition is expected to state facts that point to a 'real possibility of constitutional error.'" Blackledge v. Allison, 431 U.S. 63, 75 n. 7, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); also see Bernier v. Moore, 441 F.2d 395, 396 (1ˢᵗ Cir. 1971)(stating that "[t]he fundamental purpose of *habeas corpus* would be undermined if the writ were prostituted by holding it out as available upon mere 'notice' without any showing of entitlement.") The undersigned, therefore, finds that Petitioner

3

should complete and file a form Petition specifying each ground for *habeas* relief. Furthermore, the undersigned finds that Petitioner's "Application and Affidavit to Proceed Without Prepayment of Fees" is deficient because his form fails to include the Certificate portion to be completed by an authorized officer of the institution of incarceration.

Accordingly, it is hereby **ORDERED** that Petitioner has until **September 5, 2016**, to either pay the $5.00 filing fee, or submit the appropriate Application to Proceed *in Forma Pauperis* with the Certificate portion completed and Authorization to Release Institutional Account Information. It is further **ORDERED** that Petitioner has until **September 5, 2016**, to file his Section 2254 Petition specifically setting forth his grounds for *habeas* relief. Failure of the Petitioner to (1) file his Section 2254 Petition, and (2) either pay the filing fee or file an Application to Proceed *in Forma Pauperis* by September 5, 2016, will result in a recommendation of dismissal of this matter without prejudice pursuant to Rule 41(b) of the Federal Rules of Civil Procedure[1] and Rule 41.1 of the Local Rules of Civil Procedure for the Southern District of West Virginia[2].

---

[1] Rule 41(b) of the Federal Rules of Civil Procedure provides:

> **(b) Involuntary Dismissal: Effect**. If the plaintiff fails to prosecute or to comply with these rules or any order of court, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule - - except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 - - operates as an adjudication on the merits.

[2] Rule 41.1 of the Local Rules provides:

> **Dismissal of Actions**. When it appears in any pending civil action that the principal issues have been adjudicated or have become moot, or that the parties have shown no interest in further prosecution, the judicial officer may give notice to all counsel and unrepresented parties that the action will be dismissed 30 days after the date of the notice unless good cause for its retention on the

The Clerk is directed to mail a copy of this Order, a Form Petition Under 28 U.S.C. §
2254 for Writ of *Habeas Corpus* By a Person in State Custody, and an Application to Proceed *in Forma Pauperis* to Petitioner.

ENTER: August 4, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

---

docket is shown. In the absence of good cause shown within that period of
time, the judicial officer may dismiss the action. The clerk shall transmit a
copy of any order of dismissal to all counsel and unrepresented parties. This
rule does not modify or affect provisions for dismissal of actions under FR Civ
P 41 or any other authority.

5